NIETO v. McGRATH, U. S. Atty. Gen.
Civ. A. No. 532.

United States District Court
S. D. Texas, Laredo Division.
March 31, 1951.

John E. Fitzgibbon, Philip A. Kazen, Laredo, Tex., for plaintiff.

Brian S. Odem U. S. Dist. Atty., Bruce R. Merrill, Asst. U. S. Atty., Houston, Tex., for defendant.

ALLRED, District Judge.

Action, under 8 U.S.C.A. § 903, for declaratory judgment to establish plaintiff's status as a citizen of the United States.

Plaintiff's parents, citizens of Mexico, came to the United States about the

year 1923. Plaintiff was born in California July 28, 1925. He thus became a citizen by birth.

When plaintiff was about four years of age, his parents took him to Mexico, where he remained, working on a farm or ranch, until 1947 or 1948. When he was eight or ten years old, his mother told plaintiff he had been born in California. In July 1947, in looking through some papers in an old trunk, he found a baptismal certificate of the Catholic Church showing his birth and baptism in California. Plaintiff talked with contract laborers who had been in the United States and they told him of jobs and opportunity here.

In 1948, plaintiff came to the border and presented himself for admission as a citizen. A Board of Special Inquiry was held at Calexico, California, on April 8, 1948. Plaintiff had attended school only one year in Mexico and was able to read a little Spanish but was unable to speak English. The Chairman of the Board acted as interpreter. At that hearing plaintiff was advised as to his right to counsel and then questioned at length. Among these inquiries were: Whether the petitioner had ever made application for naturalization in Mexico, had ever been a member of the armed forces of that country, had ever registered for military service there, or had formally renounced his citizenship before a U. S. Consul, etc. To all of these questions, plaintiff answered, "No."

He was then asked (according to the record), the following questions and gave the following replies:

"Q. Have you ever voted in a political election in Mexico? A. Yes. In July 1946, I voted for Miguel Aleman for President and at the same time I voted for Rafael Garcia as Congressman. However, Garcia lost. At this moment I can't think of the name of the Congressman who was elected.

"Q. Where were you living at that time? A. At 139 Manuel Doblado, Valle de Santiago, Gto., Mexico, but at the time of the election I was working on a ranch. However, I came to town that day for the purpose of voting.

"Q. Where did you vote? A. In a small office adjacent to the Mayor's office.

"Q. Was your ballot accepted? A. Yes.

"Q. Were you urged by anyone to vote for either Aleman or Garcia? A. No. I had been thinking off and on for quite some time before the election, that I would vote for them. I faintly recall that I also voted for a new Mayor at the same time but I can't recall this for sure."

The hearing was recessed until May 12, 1948, in order to give plaintiff an opportunity to present additional evidence as to his birth and to permit the Board to further investigate. The hearing was resumed on May 12, 1948, and plaintiff was excluded from admission upon a conclusion of law, among others, that, while he had been born a citizen of the United States, he had forfeited such citizenship by voting in a foreign political election.

In July 1948, plaintiff waded the Rio Grande, near Hidalgo, Texas, in this District, and went to work in Jim Hogg County, in this District and Division. Thereafter, he was arrested on a warrant of deportation (based upon the Board of Special Inquiry findings of May 12, 1948). Another hearing was held before another Board of Inquiry, at Laredo, Texas, on October 3, 1948, plaintiff being represented by counsel.

At that time, plaintiff denied that he had voted in the 1946 election in Mexico and that he had so testified before the Board of Special Inquiry in California. He further testified that he had had only one year of schooling in Mexico and did not speak a word of English; but *the examining officers refused to permit him to testify as to whether he had understood everything that was asked at the Board hearing in California.* The Board of Special Inquiry at Laredo recommended deportation, which recommendation was adopted by the chief examiner of the Immigration and Naturalization Service. A warrant of deportation was issued but deferred pending conclusion of prosecution for illegal entry. Thereupon this action was instituted.

Upon trial, plaintiff testified, again denying that he had voted in the Mexican election and that he had so testified before the Board of Special Inquiry in California.

Defendant introduced, over plaintiff's objections, a transcript of the hearings before the Boards of Special Inquiry, properly certified to by the Department. Defendant also introduced, over objection, a letter from the Mayor of Valle de Santiago, Gto., Mexico (the place where plaintiff is alleged to have voted), addressed to the American Vice Consul at San Luis Potosi, Mexico. This letter reads as follows:

"With reference to your courteous note 221 ET/ dated the 19th instant in which you solicit a report on C. Juan Jaime Garcia Nieto, as to whether he performed his duty with reference to the dispositions of the electoral laws, emitting a vote in the presidential elections which were held in the year 1946, I am honored in making known to you that Mr. Juan Jaime Garcia Nieto, did comply with his obligation under the requirements of the law, voting in the referred Federal elections."

Attached to that letter is a document, under seal, signed by the Vice Consul at San Luis Potosi, certifying that Albino Tavera Amezcua (who signed the letter) was, on the 24th day of October 1950, "Presidente Municipal (Mayor) of the city of Valle de Santiago, Gto., Mexico," and "whose official acts faith and credit are due."

Defendant contends that this letter is admissible under 28 U.S.C. § 1740, reading as follows:

"§ 1740. Copies of consular papers

"Copies of all official documents and papers in the office of any consul * * of the United States, and of all official entries in the books or records of any such office, authenticated by the consul or vice consul, shall be admissible equally with the originals."

■ I hold that the letter is not admissible, because (1) there is no certificate that it is a copy of any official document in the office of any Consul, as required by the statute; and (2) it is not, in my opinion, such an official document or paper on file in

the Consul's office as is admissible under the statute. It is simply an ex parte statement, made in a letter to the Consul, and no more admissible than a letter to the Attorney General appearing in his files. There is no reason why defendant could not have taken the Mayor's deposition or the deposition of other persons acquainted with the facts.[1]

Plaintiff earnestly insists that the transcript of the hearings before the Board of Special Inquiry are not admissible. Defendant insists that they are admissible under 28 U.S.C.A. § 1733(b). It is not necessary for me to determine this question in view of the disposition hereafter made of the case.

Defendant contends that plaintiff forfeited his citizenship under 8 U.S.C.A. § 801(e), which reads as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\* \* \* \* \* \*

"(e) Voting in a political election in a foreign state or participating in an election or plebecite to determine the sovereignty over foreign territory; or \* \* \*."

Defendant cites Miranda v. Clark, 9 Cir., 180 F.2d 257, where the facts are strikingly similar to those *alleged* here, holding that the statute means what it says; and that it applies to a minor over the age of eighteen years.[2] Defendant also cites Savorgnan v. U. S., 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287, holding that the intent of the citizen in performing any of the acts, which would expatriate him, is immaterial. I hold, however, that the evidence does not satisfactorily show that plaintiff voted in Mexico.

Citizenship is so precious that it cannot be taken away, even for fraud, except by clear, certain, and "indeed, overwhelming" evidence. Meyer v. U. S., 5 Cir., 141 F.2d 825; Schneiderman v. U. S., 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. U. S., 322 U.S. 665, 64 S.Ct. 1240, 88 L. Ed. 1525; U. S. v. Dabdoub (my opinion unreported), Civil Action No. 488, Laredo Division. "\* \* \* expatriation being a voluntary act involving legal consequences so serious as to be almost a matter of life itself, the evidence that the act specified by the statute was committed intentionally, with knowledge of the consequences, must be, to borrow a phrase, 'clear, unequivocal, and convincing' ". Fujiko Furusho v. Acheson, D.C.Haw., 94 F.Supp. 1021, 1022.

Since forfeitures are not favored in any respect, how much more should this be true as to a forfeiture of one's citizenship in the greatest country on earth? Congress has declared that certain acts, voting in a foreign political election among them, shall forfeit citizenship; but this does not mean that the evidence to establish such an act must not be clear, certain, and "indeed overwhelming".

The only evidence that plaintiff voted in the Mexican election is his admission before the California Board of Special Inquiry. Plaintiff denied this, or even that he had so testified, before a similar Board at Laredo. He denied it upon the trial. Defendant's counsel was placed upon notice that plaintiff would so deny such fact.

---

1. In any event the letter is not of much probative force. It does not identify plaintiff as the particular person who the Mayor states, "did comply with his obligation under the requirements of the law, voting in the referred Federal elections". It does not give the date of the elections, other than the year. It does not state that the Mayor saw him vote or whether he is testifying from some record. Moreover, a Vice Consul of the Mexican Government, at Laredo, a licensed attorney, testified that the Chairman of the political party is custodian of the records in Mexico; that the records are not kept in the custody of the Mayor, or at the City Hall; that it would be impossible for the Mayor to determine from the records whether a person actually voted because the ballots are not signed.

2. In view of the provisions of 8 U.S.C.A. § 803(b) providing: "No national under eighteen years of age can expatriate himself under subsections (b) to (g), inclusive, of section 801." Plaintiff was under 21 and single at the time he allegedly voted in Mexico. According to the Vice Consul, a witness before me, a single person under 21 cannot vote under Mexican law.

154

Notwithstanding this, defendant has taken no depositions or attempted to supply any further proof other than to tender the letter from the Mayor of the Mexican town, set out above.

I am not committed to the idea that an admission, statement, or confession made before such Boards are infallible, or indeed, that they always represent the truth. Especially do I doubt their force when the parties are poor, illiterate Mexicans on the one hand and experienced Government officers on the other hand; the one unrepresented and untrained; the other well represented and well trained.

The Chairman of the Board acted as interpreter. The Secretary, another member of the Board, acted as reporter. I have had enough experience with interpreters in the courts to know that often, on crucial points, there is a disagreement between interpreters as to what a witness said, or as to the meaning of the answers he gave. I have also noted that seldom are answers given by a Mexican peon in the detailed and apparently voluntary manner in which plaintiff is reported to have answered. Uniformly the questions must be leading. Even then, generally there is considerable jabbering back and forth between the interpreter and the witness, to get a simple answer to a simple question.[3]

I cannot conceive of plaintiff being able to remember, without prompting, on April 8, 1948, the name of the man he voted for for Congress in July 1946, especially the name of the candidate who lost. If he did, then he is far more intelligent than I found him to be upon the trial; and far more intelligent, than the average voter in this section, whether of Anglo or Latin extraction.[4] It seems to me that if plaintiff were intelligent enough to give the answers freely that the record before the Board of Special Inquiry in California shows he gave, defendant could well have had some member of the Board present to testify concerning it.

As it is, all I have before me to show there was an election, when it was held, who the candidates were, or that plaintiff voted, is his admission, through an interpreter, before the California Board. The situation is not unlike a criminal case where the only evidence of the corpus delicti *and a defendant's connection with it* is a confession, alone and uncorroborated. A conviction cannot be sustained in such a situation. Vogt v. U. S., 5 Cir., 156 F. 2d 308; Colt v. U. S., 5 Cir., 160 F.2d 650.

■ Some of the cases on cancellation of citizenship hold that the evidence must establish fraud beyond a reasonable doubt, as in criminal cases. I am not prepared to

3. I have had occasion heretofore, Garza v. McGrath, my opinion unreported, Civil Action No. 542, Brownsville Division, to comment upon admissions to Immigration officials by a Latin American of the same type as plaintiff. In that case, Garza, born in Texas and taken to Mexico as a child by his parents, had waded the river and was picked up. He had admitted to the immigration officials that he was *born in Mexico*, accepted voluntary deportation and had even pleaded guilty to illegal entry into the United States. I found that Garza was actually born in Texas, beyond any doubt, and said: "I do not place too much reliance upon the admissions he made, knowing the temperament and nature of his type. They are always agreeable with those in authority; and generally feel that it is impolite to disagree."

It is interesting to note that another Judge has had similar experiences and

reached similar results at about the same time. In Ponce v. McGrath, D.C.Cal., 91 F.Supp. 23, Metzger, Chief Judge, made similar statements in much better language than I employed. I adopt, without repeating here, practically everything that Judge Metzger says in the second column on page 24 and the first column on page 25, as being applicable to this case.

4. Many surveys have been made in this country as to who Senators, Governors, Congressmen, etc. are and the replies have shown an embarrassing lack of information on the part of the person interviewed. This is a matter of common knowledge. In addition to this, I have made checks myself for many years which bear out the usual surveys. I could give a priceless example of answers to questions on yesterday, by people here in the Federal Building, among them three or four *employees* of the *immigration service*—and *my secretary*.

go that far, preferring the clear, certain and "indeed, overwhelming" rule laid down by Judge Hutcheson in Meyer v. U. S., supra. I am just not "overwhelmed" by the statement allegedly made by plaintiff to the California Board.[5]

Judgment will be for plaintiff.

The clerk will notify counsel who will prepare an order accordingly.

5. While, as held in Savorgnan v. U. S., supra, and Cantoni v. Acheson, D.C.Cal., 88 F.Supp. 576, the undisclosed intention of a national may not be relevant in determining the validity of an act of renunciation of citizenship, yet like Judge Hall, in Kuniyuki v. Acheson, D.C.Wash., 94 F. Supp. 358, 365, I am sure that the statute is not meant to be an arbitrary deprivation of a person's citizenship because of an act which he did not know the meaning of at the time he did it. "In other words, the act has to be knowingly done, and it has to be voluntarily done."

I do not believe that it is fair, or within the purview of the statute, to presume that a man of plaintiff's type, living in the interior of Mexico, knew, in 1946, that the fact that he was born in the United States made him a citizen. The record shows plaintiff's mother told him he was born in the United States when he was eight or ten years old, but it would do

violence to my experience to presume that either she or he realized that he was an American citizen because of his birth. Even had the idea occurred to him, however, he probably would have thought that he would have to have more evidence of the fact than his mother's word. He stumbled upon the old birth certificate when he was 22 or 23 years old (worn and torn when he later presented it to the Board of Special Inquiry in California). This was after the Mexican election, before he had ever been to the border, before he had opportunity to understand the precious significance of his birth.

While I hold that the Government has failed to show plaintiff voted in Mexico, even so I would say that he did not know of his citizenship or voluntarily renounce it, without more evidence than is before me now.