MATTER OF C—A—

In EXCLUSION Proceedings

A–6284229

*Decided by Board October 17, 1961*

Expatriation—Dual national—Section 350, 1952 act—Accepting benefit of foreign nationality.

Where dual national had no knowledge that he had a claim to United States citizenship at the time he accepted the benefits of foreign nationality, his action was not "voluntary" and did not result in expatriation under section 350 of the Immigration and Nationality Act (Overrules contrary holdings in *Matter of F—G—*, 4—528, and *Matter of M—*, 3—558.)

EXCLUDABLE: Act of 1952—Sections 212(a)(20) [8 U.S.C. 1182(a)(20)]—Immigrant, no visa.

### BEFORE THE BOARD

**DISCUSSION:** The Board found that the applicant is a citizen of of the United States who had not expatriated himself and ordered his admission as a citizen. The Service moves for reconsideration of the Board's order.

The applicant was born in Cuba on October 24, 1921. His father was born in the United States. There is nothing to indicate that the applicant's father lost United States citizenship before the birth of the applicant. We conclude, therefore, that the applicant became a United States citizen at birth under section 1993 of the Revised Statutes. Whether the applicant was also a citizen of Cuba at birth is also important because he could not have lost United States citizenship by the acts he performed unless he was a dual national at birth. Although there is some question as to this, we need not explore it since we find that the applicant would not have expatriated himself even if he had been a dual national at birth. We shall assume for the sake of this discussion that he was also a national of Cuba at birth.[1]

---

[1] The special inquiry officer found that the applicant had been a Cuban at birth because he had been born to Cuban parents. This is not established by the record. The applicant's paternal grandfather was born in Cuba. When he came to the United States is not known. He married a native of Cuba in

The Service is of the opinion that the applicant has lost United States citizenship under section 350 of the Immigration and Nationality Act which provides for the expatriation of a dual national who accepted benefits of his foreign nationality. The benefit relied upon here is the use of a Cuban passport after December 24, 1952. The Board held that there had been no loss of United States citizenship because the applicant had used the passport without knowledge that he had a claim to United States citizenship. Decision of the Board was based upon *Rogers* v. *Patokoski*, 271 F.2d 858 (C.A. 9, 1959), and *Nieto* v. *McGrath*, 108 F. Supp. 150 (D.C. Tex., 1951). Patokoski was born in Finland to a United States citizen. He entered the United States as a visitor of Finnish nationality in 1947. Patokoski knew his father had become a United States citizen and, in fact, had brought his father's citizenship papers to the United States with him but did not know that he had a claim to United States citizenship through his father until so informed in deportation proceedings in 1949. He then sought a judgment declaring that he was a United States citizen. The Service contended that Patokoski had lost United States citizenship under section 401(e) of the Nationality Act of 1940 which provided for the loss of United States nationality by voting in a foreign political election. The appellate court, quoting from the lower court opinion, held that Patokoski had not voted voluntarily "because he did not know he was a citizen of the United States of America when he did those things [voting, taking an oath of allegiance, serving in a foreign army], and the plaintiff has not expatriated himself or lost or abandoned his United States of America citizenship by doing those things with such lack of knowledge." The Service is of the belief that it is improper to rely upon *Patokoski* because it concerned section 401(e) of the Nationality Act of 1940 and not section 350 of the Immigration and Nationality Act. We can see no difference, in essence, between a statute which provides for the loss of citizenship by one who votes and a statute which provides for loss of citizenship by a person who accepts the benefits of a foreign nationality. If knowledge of United States citizenship is necessary in the former case, we can see no basis for making a distinction in the latter case. The Service contends that *Patokoski* is distinguished

New York in 1896. The applicant's father was born on September 2, 1898, in New York. The family returned to Cuba not too long thereafter. From 1908 until 1918, the family was again in the United States. The applicant's father returned to Cuba in 1918 and has remained there. The applicant testified that his father became a Cuban citizen about 1930. At the time of the birth of the applicant's father, his parents were Spaniards and the child became a Spaniard (Moore, *Digest of International Law*, 1906, vol. 3, p. 295). The record fails to show that the applicant's father acquired Cuban nationality at birth, or before the applicant was born.

from the instant case because Patokoski did not recognize the significance of his father's status as a United States citizen and did not know he was a citizen until after he committed the acts of expatriation, while in the instant case no such evidence exists. We find, however, that the record does establish the applicant's failure to recognize the significance of his father's status or the fact that he had a claim to citizenship until after he accepted the benefits of the foreign nationality. The record contains the uncontradicted testimony of the applicant that he had never claimed United States citizenship and was never aware that he might possibly have a claim to such citizenship prior to this exclusion hearing. A check with the State Department failed to reveal any record concerning the applicant. The applicant's credibility was not questioned by the special inquiry officer.

The Service is of the belief that *Nieto* v. *McGrath, supra,* cited by the Board, is no support for the rule that a United States citizen may not be expatriated if he had no knowledge that he had a claim to United States citizenship at the time he committed an otherwise expatriating act. We rely upon the following statement of the court found in footnote 5 on page 155:

I do not believe that it is fair, or within the purview of the statute, to presume that a man of plaintiff's type, living in the interior of Mexico, knew, in 1946, that the fact that he was born in the United States made him a citizen. The record shows plaintiff's mother told him he was *born* in the United States when he was eight or ten years old, but it would do violence to my experience to presume that either she or he realized that he was an American citizen because of his birth. Even had the idea occurred to him, however, he probably would have thought that he would have to have more evidence of the fact than his mother's word. He stumbled upon the old birth certificate when he was 22 or 23 years old (worn and torn when he later presented it to the Board of Special Inquiry in California). This was after the Mexican election, before he had ever been to the border, before he had opportunity to understand the precious significance of his birth.

While I hold that the Government has failed to show plaintiff voted in Mexico, even so I would say that he did not know of his citizenship or voluntarily renounce it, without more evidence than is before me now.

To similar effect are other cases. In *Perri* v. *Dulles,* 206 F.2d 586, 591 (C.A. 3, 1953), the court held that to deprive a United States citizen of citizenship when he did not know he had a claim to citizenship would result in constitutional difficulties. (This case was decided upon a different ground on remand. *Perri* v. *Dulles,* 230 F.2d 259 (C.A. 3, 1956).) *Petition of Acchione,* 213 F.2d 845 (C.A. 3, 1954), supports the same view. In *Jalbuena* v. *Dulles,* 254 F.2d 379 (C.A. 3, 1958), a native-born citizen of the United States who had become a citizen of the Philippines applied for a Philippine passport and subscribed to an oath to support the Constitution of the Philippines. He did this without knowing that he had re-

tained United States citizenship. The court stated that forfeiture of citizenship would result where there is some indication of flouting of obligations inherent in American citizenship and there had been no clash of responsibilities. By implication, it would be assumed that one who did not know that he had American citizenship would not be held to have flouted the obligations inherent in American citizenship. (*Contra, Schaufus* v. *Attorney General*, 45 F. Supp. 61 (D.C. Md., 1942) ; see *Cantoni* v. *Acheson*, 88 F. Supp. 576 (D.C. Cal., 1950).)

The motion cites a number of court cases which have held that in expatriation matters an objective test exists; however, in each of these cases, the individual concerned was aware that he was an American citizen. The applicant here did not know he had a claim to citizenship.

*Matter of F—G—*, 4—528, and *Matter of M—*, 3—558, which state that the lack of knowledge of a claim to United States citizenship is immaterial, must be overruled in light of subsequent court decisions. *Matter of S—*, 8—226, 232, concerned a person who knew that he had been a United States citizen but who committed an act of expatriation (voting) after he had been informed by the consul that he no longer had the right to United States citizenship. We held that expatriation had not occurred, and attempted to limit our rule to situations where an individual was unaware that he had United States citizenship because of a change of interpretation of the law or because he was misled by a Government official who had the duty to inform him. In view of *Patokoski*, it appears that our attempted limitation was stated too broadly. We must point out that there has also been administrative precedent for the view we take. The Service expressed the belief in 1959 that a dual national could not expatriate himself without having known that he was a dual national. The then Attorney General was "by no means convinced that the Service" was in error in this view (41 Op. Atty. Gen. 79 (1960) ; pp. 5, 12, slip opinion).

Counsel is of the belief that the applicant's situation was the result of misinformation on the part of officials of this Government. He points out that the immigrant visa which the applicant received on September 4, 1952, and which he presented to an immigrant inspector when he applied for admission on September 18, 1952, reveals that the applicant's father was born in the United States and that the applicant had a claim to United States citizenship. He reasons that the failure of the Government officials to inquire as to the possibility of the applicant being a citizen resulted in his entry as an alien. The contention is not without merit. The use of the Cuban passport prior to December 24, 1952, did not re-

sult in expatriation (*Matter of G—Q—*, 7—195) ; acceptance of a benefit must have occurred after December 24, 1952. The applicant's use of the passport to enter the United States after September 1952, when he was admitted for permanent residence, could reasonably be considered as having occurred on the basis of misinformation by responsible Government officials who had failed to point out the applicant's possible claim to United States citizenship. However, we need not enter into a discussion of it since it is unnecessary to a decision in view of the action we have taken.

The motion is denied.

**ORDER:** It is ordered that the motion be and the same is hereby denied.